**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

 **Plaintiff,**

**v.**                                                                    **CR 20-01571-DHU**

**JOE PURVIS,**

 **Defendant.**

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE**

On August 11, 2020, Defendant Joe Purvis was charged in a one-count indictment with

being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). *See*

Doc. 1.  On March 18, 2022, Mr. Purvis moved to suppress the evidence against him, arguing that

law enforcement officers first unlawfully detained him and then unlawfully searched him and his

vehicle.  The Court held an evidentiary hearing on the motion on May 31, 2022, and thereafter

requested additional briefing. After considering the motion, briefs and supplemental briefs,

evidence from the hearing, and relevant law, the Court concludes that Defendant's Opposed

Motion to Suppress Evidence Based on Constitutional Violations (Doc. 51) will be **GRANTED**.

**I.
FACTUAL FINDINGS**

The Court makes the following findings of fact ("FOF"), as supported by the record, in

accordance with Federal Rule of Criminal Procedure 12(d):

1.  On the morning of July 20, 2020, officers from the Albuquerque Police Department

("APD") were dispatched to the Walmart located at 301 San Mateo Blvd. SE, Albuquerque, New

Mexico responding to a call from Walmart security reporting an unconscious male subject in a white Honda Accord parked in row 7.  *See* Doc. 51-1 at 1 (Report of Investigation).

2.   The initial dispatch reported a "male passed out in [the] veh[icle]," but did not report any criminal conduct.  *See* Doc. 58-1 (7/20/20 Police CAD Report).

3.   A recording of the call made by a Walmart security guard to the police indicated that the male sleeping in the car had been there for some time and had indicated to someone he was waiting for his niece.  *See* Doc. 51, Ex. A (Audio of call to Albuquerque Police Department).

4.   There is no dispute that the entirety of the incident described below regarding the detention and search of Mr. Purvis took place on private property.

5.   After receiving the information from dispatch, APD Officers Scott Golson and John Cervantes arrived on the scene and located the vehicle parked in the Walmart parking lot.  *See* Hrg. Tr. at 15:14-18 (Golson).[1]

6.   Officer Golson was receiving "on the job training" at the time of the incident and Officer Cervantes was his training officer. *See id*. at 15:5-11.

---

[1] A substantial portion of the July 20, 2020, interaction between Defendant Purvis and law enforcement officers was captured on the lapel video camera used by Officer Golson (Govt. Ex. 3) and the lapel video camera used by his training officer, Officer Cervantes (Govt. Ex. 5). Officer's Golson's lapel video is referenced herein as "Golson Lapel Video," and the lapel video for Officer Cervantes is referenced herein as "Cervantes Lapel Video."  The lapel video segments will be referred to by minute and second as recorded on the video. Officer Golson's lapel video was transcribed and attached as an exhibit to the United States' Response. *See* Doc. 58-3.  The transcript of the lapel video recording will be referred to as "Golson Lapel Transcript."  The Court notes that upon careful review of the lapel videos submitted to the Court and the transcript of Officer Golson's lapel video, there are discrepancies and some inaccuracies in the transcript.  The Court relies more prominently on the lapel videos themselves.  In addition, for its Findings of Fact, the Court will focus on the statements and actions by the parties which the Court finds relevant to its analysis and does not recite each statement or action recorded on the lapel videos.  Finally, the Court will refer to the transcript of the May 31, 2022, evidentiary hearing (Doc. 74) as "Hrg. Tr." followed by page and line citation. All other evidentiary material will be referred to by docket entry number.

7.   When the Officers approached Mr. Purvis' vehicle, they observed Defendant Joe Purvis asleep in the driver's seat with his windows rolled down and the vehicle idling.  Mr. Purvis was not reclined in his seat, but rather sitting straight up, but unconscious.  *See* Golson Lapel Video at 0:45.

8.   As officers approached the vehicle, Officer Golson announced his presence by calling out "Sir", but the Defendant did not respond.  *Id*. at 0:46.

9.   While standing next to the vehicle, Officer Cervantes observed a pellet rifle in the back seat of the car.  Officer Cervantes reached through the open back window of the car and removed the pellet rifle from the vehicle.  *See id*. at 0:56-1:06.

10. After the pellet rifle was removed, Officer Golson, while standing next to the parked car, observed what appeared to be a firearm or a toy gun sitting on the driver's side floorboard between Mr. Purvis' legs.  *See id*. at 1:14-17.[2]

11. Officer Golson alerted Officer Cervantes of its presence, at which time Officer Cervantes drew his firearm from its holster. Officer Cervantes held his firearm in a manner that kept the muzzle of the gun pointing downward as he stood near the driver's side of the vehicle.  *See id*.

12. At no time did Officer Cervantes aim his firearm in the direction of Mr. Purvis.

13. Officer Golson called out, "Sir," again and Mr. Purvis began to wake up and move around, appearing disoriented and confused.  *See id*. at 1:18-26.

14.  Officer Golson promptly gave Mr. Purvis verbal commands to keep his hands on top of the steering wheel.  *See id*.

---

[2] Officer Golson testified that when he first observed the object on the floorboard, he was not sure if it was a real firearm or a toy gun.  *See* Hrg. Tr. at 19:21-25.

15. When Mr. Purvis did not promptly comply, Officer Cervantes directed Officer Golson to grab Mr. Purvis' hands. *See id*. at 1:24.

16. Officer Golson then reached into the vehicle and grabbed Mr. Purvis' hands, at which time Mr. Purvis cried out that the officer was hurting his hands. *See id*. at 1:24-30.

17. Officer Cervantes and Officer Golson told Mr. Purvis that there was a gun on his floorboard and directed him to keep his hands up and then to keep his hands out. *See id*. at 1:30-37.

18. Mr. Purvis, appearing disoriented, continued to state loudly that Officer Golson was hurting his hands and soon was able to pull his hands aways from the officer. *See id*. at 1:37.

19. The officers continued to explain to Mr. Purvis that there was a gun underneath him and that they needed him to put his hands out the window. *See id*. at 1:37-48.

20. Mr. Purvis then began to move about in the driver's seat and continued to complain that the officer was hurting his hands. *See id*.

21. Officer Cervantes' tone then changed and he sternly commanded Mr. Purvis to put his hands on the outside of the door of the car. *See id*. at 1:49.

22. At that time, Mr. Purvis stated that he would get out of the car and Officer Golson stated, "Step out. Step out." *Id*. at 1:50-52.

23. Officer Golson then opened the car door and again directed Mr. Purvis to step out, at which time Mr. Purvis responded, "You see how simple that was?" *Id.* at 1:54-2:02.

24. Officer Golson responded, "Cool, step out," while Officer Cervantes shouted to Mr. Purvis, "Do not reach for anything, you understand?" *Id.*

25. Mr. Purvis responded that he was not reaching for anything, and Officer Golson again stated, "Cool, step out." *Id.*

26. At this time, Mr. Purvis began to move as if he was attempting to get out of the driver's seat without using his hands, but then suddenly shifted his weight back toward the inside of the car. *See id*. at 2:17-20.

27. Officer Golson and Officer Cervantes yelled out, "Do not reach for anything!" Mr. Purvis again stated that he was not reaching for anything.  The officers responded, "Yes, you are!"  *Id*. at 2:19-20.

28. One of the officers then told the other, "Get him out of the car," while the other again told Mr. Purvis to step out.  *Id*. at 2:20-21.

29. Mr. Purvis stepped out of the vehicle and stated, "Hold on."  *Id*. at 2:21-32.

30. As Mr. Purvis stood outside the vehicle, Officer Golson directed him to put his hands behind his back, informing Mr. Purvis that he was "just being detained*." Id*. at 2:36-49.

31. Officer Golson then placed handcuffs on Defendant Purvis. *See id*.

32. Officer Golson then asked Defendant, "What's going on man?"  When Mr. Purvis did not respond, Officer Golson again asked him, "What's going on?" two more times. Again, Mr. Purvis did not respond.  *Id*. at 2:49-3:06.

33. Officer Golson then asked Mr. Purvis if he had an "ID" on him and, as he asked the question, he reached into Mr. Purvis' rear pants pocket, found Mr. Purvis' wallet, and removed it. *See id*. at 3:08-23.

34. Within seconds of Officer Golson searching Mr. Purvis' pocket and pulling out Mr. Purvis' wallet, Officer Cervantes held his hand out and stated, "I'll run him real quick." Cervantes Lapel Video at 3:25.[3]

---

[3] This exchange is not audible on Officer Golson's lapel video recording but can be clearly heard on Officer Cervantes' lapel video recording.  *See id*.  The Government does not mention this

35.  Officer Golson then pulled Mr. Purvis' driver's license from the wallet and handed it to Officer Cervantes, who walked toward his patrol car to run Mr. Purvis' information.  *See id*. at 3:25-37.[4]

36.  The lapel video recording shows that Officer Golson did not look at any other contents of the wallet, including possible medical-related information.  *See id.*

37.  At no time did Mr. Purvis provide Officer Golson with consent to retrieve the wallet from his pants or to extract the driver's license from his wallet.

38.  The officers did not return the license to Mr. Purvis after obtaining his name.[5]

39.  After giving Mr. Purvis' driver's license to Officer Cervantes, Officer Golson again asked, "What's going on dude- you Joe?"  Golson Lapel Video at 3:25-31.

40.  Mr. Purvis responded, "I'm thirsty. Can I have something to drink?" *Id.*

41.  Officer Golson responded, "I don't have anything for you to drink." *Id*. at 3:34.

42.  Officer Golson then called out again, "Joe?"  At that time, Mr. Purvis began to sway and lose his balance, falling back onto the side of his vehicle and onto his knees.  *Id*. at 3:38-48.

43.  Officer Golson asked, "Are you having a medical?" Mr. Purvis responded, "I need something to drink, I'm thirsty." *Id*. at 3:49-52.

44.  Officer Golson then stated, "Ok, but why are you falling down, man?" *Id*. at 3:54-56.

45.  Mr. Purvis repeated, "May I have something to drink, I'm thirsty." *Id.* at 4:00-03.

---

exchange in its briefs and Officer Golson did not mention it while giving testimony at the motion hearing.

[4] Officer Cervantes' lapel video recording ends once he takes Mr. Purvis' driver's license and walks toward his police vehicle.  *See id*.

[5] Later, Officer Cervantes would tell Officer Golson that rescue personnel had kept Mr. Purvis' identification.  *See infra*, FOF 98.

46. The officer again responded, "I don't have anything for you to drink." *Id.* at 4:04-06.

47. Mr. Purvis, still on his knees, began to sway and again stated he was thirsty. *See id*. at 4:10-11.

48. At this point, at least four paramedics with the Albuquerque Fire Department ("AFD paramedics") arrived and Officer Golson told them, "He says he's thirsty, but he is falling down and shaking." *Id*. at 4:11-12.[6]

49. One of the AFD paramedics asked Mr. Purvis, "What did you take friend?" *Id*. at 4:14.

50. At that time, Mr. Purvis struggled to his feet and responded, "Corona virus made me...can I have something to drink?"  He then started shouting, "I am thirsty! I am thirsty! Can I have something to drink?"  *Id*. at 4:15-25.

51. One of the AFD paramedics stated, "You need to calm down," and another told Mr. Purvis, "We have no water friend." *Id*. at 4:25-27.

52.  Mr. Purvis continued to stand, swaying in an awkward manner.  *See id*.

53. An AFD paramedic approached him and asked, "Hey brother, what's your name? What's your name, man?" *Id*. at 4:35.

54. As the AFD paramedic asked this question, Officer Golson, again without consent, reached into Mr. Purvis' front right pocket and then turned Mr. Purvis around and up against the vehicle. Office Golson then patted Mr. Purvis' left front pocket. *See id*. at 4:37-42.

55. While Officer Golson did this, Mr. Purvis did not respond to questions about his name, but instead repeated several times that he "was thirsty." *Id*.

56. One of the AFD paramedics then asked, "Is that your name?" *Id*. at 4:47.

---

[6]  The transcript of Officer Golson's lapel video indicates that Officer Golson was speaking to Officer Cervantes at this point, but the lapel video shows he was most likely communicating with the AFD paramedics who had arrived at the scene*. See id.*

57. Mr. Purvis then stated, "I hope you all catch the Corona and die." *Id*. at 4:52-54.

58. As Mr. Purvis stood up against the vehicle, he continued to squirm. *See id*. at 4:57-5:11.

59. He then turned around to face the AFD paramedics and stated, "I'm fucking thirsty, man, you guys are fucking ..." *Id*. at 5:11-15.

60. As he stood against the vehicle, with hands cuffed behind his back, Mr. Purvis' pants fell to his knees. As he struggled to pull them up, Officer Golson kept him from falling by holding him up with one extended hand. *See id*. at 5:17-30.

61. Once he was able to pull his pants up using the hands behind his back, Mr. Purvis again stated he was thirsty, turned toward the vehicle and kicked the side of the car, shouting, "Can I get something to drink man? I'm fucking thirsty, man! Can I get something to drink?!" *Id*. at 5:36-45.

62. One of the AFD paramedics told Mr. Purvis to calm down. *See id*. at 5:46.

63. For the next several minutes, the AFD paramedics discussed the situation as they stood in a group away from Mr. Purvis. During that time, Officer Golson stood directly behind or in front of Mr. Purvis, as he continued to sway and squirm with his hands cuffed behind his back. *See id*. at 5:46-9:00.

64. As the AFD paramedics conferred with each other, Mr. Purvis' pants fell again, but he did not attempt to pull them back up. *See id*.

65. Occasionally, Mr. Purvis would repeat that he was "fucking thirsty," and asked, "Can I have water, please?" *See id*. at 8:29.

66. Again, one of the AFD paramedics responded that they had no water to give him. *See id*.

67. Mr. Purvis then asked, "Can you at least treat me like a human being...please do so?" Someone responded, "I am." *Id*. at 8:30-34.

68. Eventually, an ambulance arrived and a female medic ("ambulance medic") approached, stating, "Hey Joe. Joe, can you talk to me? Joe?"  Mr. Purvis then repeated that he was thirsty.  The ambulance medic then stated, "I get that you're thirsty, but can you please tell me what's going on today?"  *Id*. at 9:00-15.

69. Mr. Purvis again responded that he was thirsty. *See id.*

70. The ambulance medic responded, "You're thirsty, that's all? Can you tell me what your name is?"  *Id*. at 9:15-19.

71. Mr. Purvis did not respond.  The ambulance medic then threw up her hands and walked away. *See id*. at 9:19-21.

72. After the Fire Department paramedics and the ambulance medic discussed the situation, one of the paramedics approached Officer Golson and explained to him that they were going to place Mr. Purvis on a gurney and that they needed the officer to uncuff him as they did so.  *See id*. at 9:33-40.

73. The AFD paramedics then directed Mr. Purvis over to a gurney and helped him sit down. *See id*. at 9:50-10:00.

74. While several AFD paramedics held Mr. Purvis, Officer Golson attempted to unlock his handcuffs.  At that time, Mr. Purvis jerked and shouted out, " I hope you're ready [not discerned] Get ready! Get ready!" *Id*. at 10:00-28.

75. An AFD paramedic then stated, "See with that, he's getting fucking sedated. He's already telling us he's going to swing at us?  Fuck that, he's getting sedated."  *Id*. at 10:28-35.

76. Mr. Purvis then began sporadically shouting, "Aah!" as he continued to squirm while sitting on the gurney.  *Id*. at 10:37-51.

77. Several AFD paramedics and Officer Golson continued to hold Mr. Purvis as the ambulance medic prepared to inject Mr. Purvis with a sedative.  *See id*. at 10:51-11:35.

78. Mr. Purvis squirmed aggressively for a moment and again said, "you won't give me water, I'm fucking thirsty." *Id*. at 11:30-35.

79. At that time, Officer Golson stated, "Hey, you want to go just go for his thigh?  I have an exposed thigh right here. I've got a butt." *Id.* at 11:34-38.

80. Mr. Purvis, apparently realizing he was about to be injected with a needle, yelled out, "Don't do that! I can't take that! I'm allergic to that! I'm allergic to that!"  *Id.* at 11:38-41.

81. One of the individuals holding Mr. Purvis said, "It's going to make you feel good." *Id*. at 11:41-45.

82. Mr. Purvis stated, "I'm already feeling good. I'm already on all kinds of drugs!" *Id*.

83. A female voice then asked, "What kind of drugs are you on?" *Id*. at 11:45-50.

84. Mr. Purvis stated, "I'm on...don't remember….," but did not complete a coherent response. *Id.*

85.  Mr. Purvis was then sedated, and he laid down on the gurney. *See id*. at 11:55-12:50.

86. After a few moments, the officers and AFD paramedics assisted him in sitting up again. *See id*. at 12:50-60.

87.  One of the officers then asked, "Joe, can you talk with us?" *Id.*

88. Again, Mr. Purvis did not respond.

89.  As Mr. Purvis was held on the gurney in a sitting position, Officer Golson uncuffed him. *See id*. at 13:12-44.

90. After being uncuffed, Mr. Purvis was laid on the gurney, strapped down and transported away from the scene.  *See id*. at 13:50-14:11.

91. Up until this time, Officer Golson did not have probable cause to believe a crime had been committed. *See* Hrg. Tr. at 46:7-11 (Golson).

92. After Mr. Purvis had been removed from the scene, Officer Golson approached Officer Cervantes and a female APD officer who were standing near the open door of Mr. Purvis' vehicle.

93. Officer Golson, looking into the vehicle's driver's side compartment, then asked, "You said it's a bullet down here?" Golson Lapel Video at 14:15-20.

94. The female APD officer responded, "Looks like it." *Id*.

95. Officer Cervantes agreed, but indicated he was not certain whether the firearm was real. Officer Cervantes then stated, "[W]e need to figure out- can we find out if he has warrants first, so if we need to go with him? And even if not, if that's a real firearm, I'm sure he's a convicted felon." *Id*. at 14:45-55.

96. The female officer questioned whether Mr. Purvis could be charged with negligence, to which Officer Cervantes responded, "Oh, he's a convicted felon . . . He had probation for robbery." *Id*. at 14:55-15:08.

97. Officer Golson then asked Officer Cervantes, "You still have his ID?" *Id*. at 15:11-19.[7]

98. Officer Cervantes replied, "No, uh 43[rescue personnel] has his Id.  I have his 49 [information] in my [inaudible]." *Id*.

99. The information Officer Cervantes referred to could only have been obtained by running Mr. Purvis' identification through either the National Crime Information Center ("NCIC") database or another law enforcement database used by the Albuquerque Police Department after

---

[7] This exchange is not recorded on the transcript of the lapel video but is heard on the Golson lapel video itself.  *See id*.

Officer Golson searched Mr. Purvis and handed Mr. Purvis' driver's license to Officer Cervantes. FOF 34, 35.

100. Officer Golson exclaimed, "We're going to have to tow this fucker anyways." *Id*. at 15:21-24.

101. Officer Cervantes responded, "Well, yes and no." *Id*. at 15:24-27.

102. Thereafter, the officers continued to discuss the vehicle. *See id*.

103. The female APD officer stated, "John wants to verify that he's felony 29 so that we have him arrested and then go home." *Id.* at 15:30-41.

104. Officer Golson then expressed his opinion that since Mr. Purvis had been transported, APD officers had to tow the car.  *See id.* at 15:43-50.

105. During this discussion, an AFD paramedic reached into the vehicle and turned off its engine. *See id*. at 16:15-20.

106. Officer Cervantes, the training officer, then continued, "So if he does have his warrants, we'll do an inventory.  First thing we'll do is we'll look at that.  If we can find out if it's a real firearm, we'll just bag that right away." *Id.* at 16:45-55.

107. Officer Golson then repeated his opinion, "Well, with him being transported, we've got to tow it anyways, right?" *Id*. at 16:59-17:02.

108. Officer Cervantes disagreed and responded, "It's private property. It's up to them at this point. You're going to – yeah, you'll fuck up a gun case because they'll say, well, you didn't have the – per your SOP, you didn't have the right to inventory because he's only getting transported today." *Id*. at 17:02-15.

109. Officer Golson continued, "Right, but we can't leave this car." *Id*. at 17:15-17.

110. Officer Cervantes then repeated, "That's up to the private property [owner].  So you basically tell Wal-Mart, it's up to you."  *Id*. at 17:17-25.

111. Officer Golson then walked away from the scene after expressing to his training officer that he wasn't trying to argue with him.  *See id*. at 17:25-17:31.

112. Sometime thereafter, using the information obtained from the search of Mr. Purvis' pocket, officers were able to confirm that the warrants for Mr. Purvis were active and he was then placed under arrest.  *See* Hrg. Tr. at 54:10-15 (Golson).

113. It is not clear from the record where Mr. Purvis was when he was arrested as he had already been transported from the scene.

114. After Mr. Purvis' arrest, Officer Golson began to conduct an inventory search of Mr. Purvis' vehicle.  *See id*.

115. During that search, Officer Golson determined that the firearm found on the floorboard was real and he then ceased the inventory search.  *See id.*

116. The vehicle was then sealed and towed from the scene. *See id*. at 54:15-22.

117. Two days later, a search warrant for the vehicle was obtained by Alcohol Tobacco and Firearm ("ATF") Task Force Officer Victor Hernandez. *See id*. at 54:23-24; Doc. 58-7.

118. The request for the search warrant was based on the information obtained by APD officers when they ran Mr. Purvis' personal information through law enforcement databases, including the NCIC.  *See* Doc. 51-1.

119. On that same day, APD Crime Scene Investigator M. Maestas executed the warrant and recovered a Jimenez Arms, J.A. Nine, 9mm handgun, along with 13 rounds of ammunition from within the car. *See* Doc. 51-1 (Report of Investigation).

120. On August 3, 2020, ATF Officer Hernandez transported Mr. Purvis from the Metropolitan Detention Center into federal custody. *See* Doc. 51, Ex. E (Audio Recording of Transport).

121. During the transport, ATF Officer Hernandez provided Mr. Purvis his *Miranda*[8] warnings and subsequently questioned him. Thereafter, Mr. Purvis made several potentially incriminating statements regarding the immediate offense. *See id*.

## II.
## ANALYSIS

Defendant Purvis moves to suppress the evidence obtained during his July 20, 2020, encounter with law enforcement officers as well as the post-arrest statements he made to a federal law enforcement officer. Mr. Purvis argues that his initial detention by police officers was unlawful, that the search of his person and the seizing of his wallet and identification violated his rights under the Fourth Amendment to the Constitution, and that running his information through law enforcement databases was unreasonable where the police had no reasonable suspicion or probable cause to believe he had committed a crime. Mr. Purvis argues that this evidence, which includes the information related to his outstanding warrants and felon status as well as his post-arrest statements, must be excluded under the "fruit of the poisonous tree" doctrine because it was obtained unlawfully.

The United States contends that the seizure and detention of Mr. Purvis, as well as the removal of his wallet and the check of his criminal history, were all justified under the "community caretaker" exception to the Fourth Amendment's warrant requirement. According to the Government, the APD officers involved in the detention and search of Mr. Purvis were acting only in their capacity as caretakers trying to determine whether Mr. Purvis required medical assistance,

---

[8] *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and that they were not engaged in investigating Mr. Purvis for any alleged criminal conduct.  The Government further argues that the information obtained regarding Mr. Purvis' outstanding warrants and felon status, as well as the physical evidence obtained from his vehicle, would have inevitably been discovered and thus suppression is not warranted.

### A.        The Protections of the Fourth Amendment

The Fourth Amendment protects the "right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As to seizures of persons, determining whether an investigative detention is reasonable under the Fourth Amendment necessitates a two-fold inquiry.  *See United States v. King*, 990 F.2d 1552, 1557 (10th Cir. 1993).  First, an officer's actions must be "justified at its inception." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).   For an investigative detention, this means that "the officer must have an articulable and reasonable suspicion that the person detained is engaged in criminal activity." *King*, 990 F.2d at 1557.   Second, the officer's actions must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879).  The Tenth Circuit has recognized an exception to the requirement that an officer have reasonable suspicion to briefly detain an individual.  *See King*, 990 F.2d at 1560.  As part of their community caretaking duties, officers may briefly detain an individual without reasonable suspicion that a crime is being committed if the officers are acting to protect the safety of the individual or the public.  *See id.*; *see also Novitsky v. City of Aurora*, 491 F.3d 1244, 1253 (10th Cir. 2007).

As to searches, the Fourth Amendment is implicated when a defendant shows both "'a subjective expectation of privacy in the object of the challenged [intrusion],' and that 'society [is] willing to recognize that expectation as reasonable.'" *United States v. Neugin*, 958 F.3d 924, 930

(2020) (quoting *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.CT. 1809, 90 L.Ed.2d 210 (1986)).

"A search typically requires a warrant based on probable cause." *Id*. (citing *United States v. Dalton*, 918 F.3d 1117, 1127 (10th Cir. 2019)).  "Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment – subject only to a few 'specifically established and well-delineated exceptions.'" *Id*. (quoting *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003)).  Although a defendant bears the burden of whether and when the Fourth Amendment is implicated during any particular seizure or search, *see United States v. Hernandez*, 847 F.3d, 1257, 1263 (10th Cir. 2017), "[t]he government then bears the burden of proving that its warrantless actions were justified [by an exception]." *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994).

1.  **The Initial Seizure and Detention of Mr. Purvis was Justified by the Community Caretaking Exception to Warrantless Detentions.**

"[T]he Fourth Amendment's protection against 'unreasonable…seizures' includes seizure of the person."  *King*, 990 F.2d at 1556 (quoting *California v. Hodari D*., 499 U.S.621, 624, 111 S.Ct. 1547, 1549, 113 L.Ed.2d 690 (1991)).  Defendant Purvis argues that his initial seizure and detention by the APD officers constituted an unlawful, warrantless arrest.  Citing and relying on reasonable suspicion cases like *United States v. Leos-Quijada*, 107 F.3d 786 (10th Cir. 1997) and *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), Defendant asserts that to have conducted a lawful detention, the detaining officers must have had a particularized and objective basis for suspecting Defendant was engaged in criminal activity.  Under the circumstances in this case, asserts Defendant, it was unreasonable for officers to have suspected he was engaged in legal wrongdoing because there was no report of criminal activity, Walmart security did not allege Defendant was trespassing, and the mere presence of a firearm in the vehicle could not rise to a suspicion of criminal activity in New Mexico because under state law it is lawful

to carry a firearm in a vehicle. Therefore, the totality of the circumstances indicates that APD officers unlawfully seized and detained Defendant with no reasonable suspicion that he was engaged in the commission of a crime.

The Government does not dispute that the APD officers lacked reasonable suspicion to believe Mr. Purvis was engaged in criminal activity but argues that the initial seizure and detention of Mr. Purvis by the APD officers was nevertheless justified by the "community caretaker" exception to the Fourth Amendment. The APD officers were responding to a call that involved an individual found unconscious in a parked, but idling car in a privately-owned parking lot with the vehicle's windows rolled down. When officers approached and announced their presence, Mr. Purvis did not immediately respond and it was then that one of the officer's observed, in plain view, a pellet rifle in the back seat which he retrieved through the open window of the car. Within seconds, and before the officers could inquire further into whether Mr. Purvis needed assistance, Officer Golson observed what appeared to be a firearm on the floorboard of the driver's seat which was within reach of Mr. Purvis. It was only then that the officers commanded Mr. Purvis to place his hands on the steering wheel and, when he did not comply, asked that he step out of the vehicle. Once out of the vehicle, Officer Golson placed him in handcuffs. All of this, claims the United States, was initiated to ensure the safety of officers and Mr. Purvis and not for the purpose of investigating criminal activity.

The Government is correct that federal courts have recognized that one exception to the warrant requirement "is a search or seizure conducted pursuant to police officers' 'community caretaking functions.'" *United States v. Venezia*, 995 F.3d 1170, 1175 (10th Cir. 2021). The community caretaker principle allows law enforcement officers to "effect a brief non-investigatory detention in the exercise of their community caretaking functions, regardless of suspected criminal

activity, when articulable facts indicate the need 'to assure the safety of the public and/or the

individual.'" *Novitsky*, 491 F.3d at 1253 (quoting *King*, 990 F.2d at 1560).  Like an investigative

detention, a detention under the community caretaking exception:

> must be based upon specific and articulable facts which reasonably warrant an
> intrusion into the individual's liberty. Additionally, the government's interest must
> outweigh the individual's interest in being free from arbitrary governmental
> interference. Finally, the detention must last no longer than is necessary to
> effectuate its purpose, and its scope must be carefully tailored to its underlying
> justification. Once the officer has completed the inquiry necessary to satisfy the
> purpose of the initial detention, he or she must allow the person to proceed unless
> the officer has a reasonable suspicion of criminal conduct.

*United States v. Garner*, 416 F.3d 1208, 1213 (10th Cir. 2005) (internal citations and quotations

omitted).

In *King*, an opinion the Court finds particularly instructive, the Tenth Circuit considered

whether the initial seizure and detention of an individual was justified by the community

caretaking exception.  In that case, an Albuquerque Police Department officer responded to a

traffic accident at an intersection where the flow of traffic had been significantly impeded. *See*

*King*, 990 F.2d at 1555.  The officer's attention was diverted to a vehicle with heavily tinted

windows whose driver was honking his horn incessantly.  *See id*.  The officer approached the car

to inform the driver of the hazardous condition at the intersection and to advise him to stop blaring

his horn.  *See id*. When she approached the car, the officer noticed, through a partially rolled down

window, a nine-millimeter pistol with a clip inside the weapon on the drivers' seat and partially

tucked under the driver's right thigh.  *See id*.   The officer also noticed that there was a passenger

in the car.  *See id.*

Upon observing the firearm, the officer drew her service revolver, pointed it at the driver,

Mr. King, and ordered him to place his hands on the steering wheel, threatening to shoot him if he

did not comply with her order.  *See id*.  The officer would later testify that, while she did not

suspect either the driver or the passenger of the car to be engaged in any criminal activity, she took this action because she was concerned for the safety of herself and bystanders. *See id*. After ordering Mr. King to put his hands on the steering wheel, the officer radioed for assistance and another APD officer arrived. *See id*. The second officer ordered Mr. King to exit his vehicle while keeping his hands in view, and Mr. King complied. *See id*. The passenger also exited the vehicle. *See id*. The officers then ordered Mr. King to move backwards and get down on his knees, which he did. *See id*. The first officer on the scene then handcuffed Mr. King while another officer removed the firearm from the front seat. *See id*. While this was going on, the passenger of the vehicle was seen dropping a bag of drugs near a utility box and both the driver and the passenger were arrested and charged with drug possession. *See id*.

The district court determined that the initial seizure and detention of the defendant violated the Fourth Amendment, reasoning that since state law permitted motorists to carry loaded guns in their vehicles, the APD officer lacked reasonable suspicion to believe Mr. King and his passenger were engaged in criminal activity, thereby rendering their detention unlawful under *Terry v. Ohio*. *See id*. at 1556.[9] The Tenth Circuit, however, disagreed, rejecting the district court's application of the reasonable suspicion of criminal activity standard to the facts of the case. As explained by the circuit court, "Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to the desire to prosecute crime." *Id.* at 1560 (quoting *Terry*, 392 U.S. at 13, 88 S.Ct. at 1875). As such, "police officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions.'" *Id.* (quoting *Cady v.*

---

[9] As was the case in the initial detention of Mr. Purvis, the presence of the firearm in *King* did not rise to reasonable suspicion of a crime because New Mexico state law permits motorists to carry loaded weapons, concealed or otherwise, in their vehicles. *See id*. (citing N.M. Stat. Ann. § 30-7-2(A)(2) (Michie. Supp. 1992)).

*Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973)).  When acting in this non-investigatory, community caretaking capacity, law enforcement officers may have occasion to seize a person to "ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *Id*. (citing *United States v. Rideau*, 949 F.2d 718, 720 (5th Cir. 1991)).

The Tenth Circuit, applying these principles, then explained that the APD officer involved in the initial seizure and detention of Mr. King and his passenger was clearly exercising her "community caretaking function" when she approached Mr. King's car during her investigation of a vehicle accident. *Id*. at 1561.  Mr. King's honking at the site of the accident gave the officer a specific, articulable basis to briefly detain Mr. King to advise him to stop using his horn. *See id*. Once she observed the firearm in the car within reach of Defendant, the APD officer was further justified in separating Mr. King and his passenger from the firearm by ordering them out of the car. *See id*. at 1562.  The fact that the firearm may have been lawfully possessed by Mr. King had "no bearing on the reasonableness of [the APD officer's] actions because the interest justifying her separation of [King and his passenger] from the pistol is her safety, and a legally possessed weapon presents just as great a danger to her safety as an illegal one." *Id*. at 1561 (citation omitted).

Here, the initial interaction between Defendant Purvis and Officers Golson and Cervantes is similar in many respects to the situation in *King*.  The question here, as it was in *King*, is whether, based on specific articulable facts, the seizure of Defendant Purvis – grabbing his hands, having him step out of his car and placing him in handcuffs, was reasonable to assure the safety of the public or the individual.  Specifically, the Court must determine whether the governmental interest in keeping the individual and the public safe outweighs the individual's interest in being free from

government interference. *See King*, 990 F.2d at 1560.    The Court finds that, under these circumstances, the answer can only be in the affirmative.    Officers Golson and Cervantes were dispatched to the Walmart parking lot after Walmart security reported that a man was unconscious in his vehicle. FOF 3-5.    When the Officers approached Mr. Purvis' vehicle, they observed Mr. Purvis asleep in the driver's seat with his windows rolled down and the vehicle idling.    FOF 7. At this point, although there was no indication that a crime was being or had been committed, it was reasonable for officers to approach the car to determine if Mr. Purvis was in need of assistance, especially since it was reported that Defendant had been in the car for some time, was unconscious but sitting up in his seat rather than in a reclined position, and the car, although parked in a parking space, was running.    FOF 3, 7. Once officers arrived, their focus was clearly on making contact with Mr. Purvis to determine if the situation required their intervention or assistance.    Based on the information officers received before approaching Mr. Purvis, and the nature of the initial approach to Defendant's car, the Court determines that Officers Golson and Cervantes were acting in a non-investigatory capacity when they first encountered Mr. Purvis.

Almost immediately after the initial contact with Defendant, officers noticed, in plain view, a pellet rifle in the back seat of Defendant's car and then what appeared to be a handgun on the driver's side floorboard within reach of Mr. Purvis.    FOF 10, 11.    As was the case in *King*, the officers in this case were justified in first briefly detaining Mr. Purvis and then taking action to ensure Mr. Purvis did not reach for the firearm, which included trying to secure his hands, separating Defendant from the area where the firearm was located and telling him to step out of the car.    FOF 15-29.    While he was trying to get out of the car, Defendant moved at one point back into the vehicle, causing the officers to believe that he may have been reaching for the firearm and causing them to yell out "Do not reach for anything!" FOF 26-27.    Once out of the vehicle,   Officer

Golson then placed the handcuffs on Defendant Purvis to ensure that he would not injure himself or anyone else.  FOF 30-31.

Based on these facts, demonstrated in large part by the lapel video footage from Officers Golsen and Cervantes, the Court concludes Officers Golsen and Cervantes were acting reasonably and in their caretaking function when they removed Mr. Purvis from his vehicle and initially detained him.  The officers' conduct with Mr. Purvis was reasonable to assure the safety of the public as well as the safety of Mr. Purvis himself.[10]

## 2. The Warrantless Search of Mr. Purvis' Person Without Consent Violated the Fourth Amendment.

The inquiry, however, does not end upon finding that the initial interaction and detention of Mr. Purvis was conducted pursuant to the officers' community caretaking duties because the actions taken by the APD officers did not end after they separated Mr. Purvis from the vehicle and placed him in handcuffs.  Thereafter, without consent or warrant, and, as admitted by Officer Golson, without reasonable suspicion or probable cause that a crime had been committed, Officer Golson conducted a search of Mr. Purvis' person.  More specifically, as he asked Mr. Purvis if he had identification, Officer Golson simultaneously reached into Mr. Purvis' back pocket, removed his wallet, and then took from the wallet his driver's license and handed it to Officer Cervantes so that it could be "run" through a law enforcement database.[11]  FOF 33-37, FOF 91.  It was from this

---

[10]  Whether or not the officers suspected criminal activity when they saw the gun is not relevant because if the gun was a real firearm (as opposed to a toy gun or a pellet gun), it would have posed a significant danger even if no crime was in process; thus, the Court finds it was reasonable for officers to have been concerned both for their safety and that of Mr. Purvis and to have taken steps to alleviate that concern. *See King*, 990 F.2d at 1561.

[11]  In its initial response to Defendant's Motion to Suppress, the United States did not mention the fact that a search of Mr. Purvis' person was even conducted.  *See* Doc. 58.  It was not until the hearing on the motion, when Officer Golson testified that he took Mr. Purvis' wallet from his pocket, that the issue of a search arose, prompting the Court to order supplemental briefing on the legality of the search.

search that officers obtained information regarding Defendant Purvis that ultimately led to his arrest on outstanding warrants. FOF 99, 112.

It is well settled that under the Fourth Amendment, "'[n]o right is held more sacred, or is more guarded, by common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.'" *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).   That officers may be acting in their community caretaking role when they initially detain an individual does not mean that constitutional protections end. The protections of the Fourth Amendment extend to individuals seized in the course of police officers' exercise of community caretaking functions. *See King*, 990 F.2d at 1560. Thus, even when an officer is acting within his or her community caretaking function, once the officer "has completed the inquiry necessary to satisfy the purpose of the initial detention, he or she must allow the person to proceed unless the officer has a reasonable suspicion of criminal conduct." *Garner*, 416 F.3d at 1213 (citing *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994)).[12]  It is also well-settled that the community caretaking exception extends only to conduct that is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Dombrowski*, 413 U.S. at 441, 93 S.Ct. 2523; *see also King*, 416 F.3d at 1560. It does not apply when alleged community-caretaking functions are extended and used as a

---

[12] It is worth noting that in *King*, although the officers' initial actions were found to be justified and reasonable under the community caretaking exception, the Tenth Circuit ultimately found the officers' actions exceed the scope of the exception and violated the Fourth Amendment when they continued to detain the defendant in that case beyond that which was necessary to satisfy the purpose of the initial detention. *See King*, 990 F.2d at 1563.

"subterfuge for criminal investigations." *South Dakota v. Opperman*, 428 U.S. 364, 370 n.5, 96 S. Ct. 3092, 3098, 49 L. Ed. 2d 1000 (1976).

In this case, the Government does not dispute that the search of Mr. Purvis was conducted without a warrant and without probable cause, but nevertheless contends that the search of Mr. Purvis' person was also justified by the community caretaking exception. The Government argues that the search was intended only "to obtain [Mr. Purvis'] name to communicate with him regarding his condition, not to perform a criminal investigation." Doc. 70 at 10. The record, however, shows otherwise. More specifically, although not mentioned in any of the Government's briefing and not raised by the Government during the evidentiary hearing on the matter, the lapel videos for Officer Cervantes shows that Officer Golson took Mr. Purvis' wallet from his pocket, pulled out his identification and briefly glanced at it before handing it to Officer Cervantes who stated, "I'll run him real quick." FOF 34. Officer Cervantes then took the identification and walked toward his patrol car to submit Mr. Purvis' information into a criminal database system. FOF 35. Although it is unclear from the record whether officers ran Mr. Purvis' information first through the NCIC system or through some other law enforcement database used by the Albuquerque Police Department, there is no question the information eventually leading to the arrest of Mr. Purvis- his status as a felon and outstanding warrants- was obtained through this process. This series of events leads the Court to conclude, and make a factual finding, that the search of Mr. Purvis was conducted to investigate whether he had any outstanding criminal warrants as well as to determine his name. Therefore, the warrantless search of Mr. Purvis' pocket, conducted without probable cause, was not "wholly unrelated to the desire to prosecute crime" as required by the community care doctrine and therefore the exception does not apply. *King*, 990 F.2d at 1560; *see also Dombrowski*, 413 U.S. at 441; *Neugin*, 958 F.3d at 930-931. Because the United States does not

provide any binding authority to justify the warrantless search of an individual's person conducted without probable cause and outside the community caretaking function, the Court concludes that the search of Mr. Purvis' pocket violated the Fourth Amendment.

### 3. **The Cases the Government Relies On Are Not Controlling**

In support of its argument that the search of Mr. Purvis was justified by the community caretaking exception, the Government relies on the Tenth Circuit's decision in *Garner*, 416 F.3d at 1208, and the Fourth Circuit's decision in *United States v. Johnson*, 410 F.3d 137 (4th Cir. 2005). The Court does not find these cases dispositive of the issue.

> a.  <u>*Garner* does not support the United States' contention that it was lawful for Officer Golson to conduct a warrantless search of Mr. Purvis' person without his consent.</u>

In *Garner*, the Tenth Circuit reviewed a district court's denial of a motion to suppress in a case involving the detention of an individual who was laying in an open field outside of an apartment complex. *See Garner*, 416 F.3d at 1211. The officer responding to the scene suspected the defendant of public intoxication and believed he needed medical attention. *See id*. As the defendant walked away from police, the officer told him to come back and sit down so that fire department personnel could examine him. *See id*. The defendant in that case argued that the officer who detained him lacked reasonable suspicion to do so and thus had violated his Fourth Amendment rights. *See id*. at 1212. The district court, and ultimately the Tenth Circuit, found otherwise, determining that the initial detention of the defendant was reasonable because the stopping officer had both reasonable suspicion to believe a crime was being committed (public intoxication) and was exercising a community caretaker function when he initially detained the defendant so that fire department personnel could determine if he needed medical attention. *See id*. at 1214.

*Garner* does not support the Government's argument that the search of Mr. Purvis was lawful. First, *Garner* is readily distinguishable from the case here because *Garner* did not involve a search of the defendant's person. Although the defendant in *Garner* was later arrested on outstanding warrants, the personal information obtained that led to his arrest was voluntarily provided to law enforcement by the defendant and there was no allegation that the information was unlawfully obtained. *See id*. at 1211. Here, the arrest of Mr. Purvis was based on information *not* voluntarily provided by Mr. Purvis but instead discovered as a result of the unlawful search of his pocket. *Garner* does not address the question whether, or under what circumstances, an officer can search a defendant's person without consent or warrant. Second, *Garner* involved a situation where the detaining officer was not only acting in his community caretaking capacity, but also had reasonable suspicion that the defendant in that case had committed a crime. In this case, Officer Golson testified at the hearing that from the time he and Officer Cervantes first encountered Mr. Purvis until the time Mr. Purvis was taken from the scene by ambulance, he held no reasonable suspicion and had no probable cause to believe Mr. Purvis was engaged in a crime – rendering the constitutional analysis distinct from that in *Garner*. FOF 91; *see* Hrg. Tr. at 46:7-11 (Golson).[13] *Garner* is simply not on all fours with the case at hand.[14]

---

[13]   Ultimately, in determining whether reasonable suspicion exists the officer's subjective motivations are irrelevant; courts instead consider the totality of the circumstances and the information available to the officer to determine whether reasonable suspicion exists. *See United States v. McHugh*, 639 F.3d 1250, 1255-56 (10th Cir. 2011). In this case, the Court agrees with Officer Golson that, considering the totality of the circumstances, the APD officers had no probable cause or reasonable suspicion to believe a crime was or had been committed by Mr. Purvis.

[14] To the extent the Government relies on *Garner* for the proposition that the initial warrantless detention of an individual can, in certain circumstances, be justified under the community caretaking exception, the Court agrees that this is the law in the Tenth Circuit. The Court's finding that the initial detention of Mr. Purvis was not unconstitutional is based on that principle. *See supra,* Section II, A, 1.

b. The Fourth Circuit's opinion in *Johnson* also does not advance the Government's argument regarding the search of Mr. Purvis' pocket in this case.

The Government's reliance on *United States v. Johnson* is similarly misplaced.  In that case, a federal parks police officer responded to the report of a car accident that had occurred on federal property.  *See Johnson*, 410 F.3d at 141.  At the scene of the accident, the officer found the defendant inside his vehicle, conscious but unresponsive.  *See id*.  The officer then asked the defendant several times if he was okay, but the defendant would not or could not answer him.  *See id*.  The officer opened the passenger door to the car and reached inside the glove compartment to find identification, believing that he might get a response from the defendant if he called him by name.  *See id*. at 141-142.  Inside the compartment, he found a nine-millimeter handgun, which led to the defendant's arrest for possessing a gun on federal property.  *See id*. at 142.  In the district court, the defendant sought to suppress the evidence against him arguing that the federal park police violated the Fourth Amendment by conducting a warrantless search of his glove compartment.  *See id*.  The district court denied the motion, finding that a variant of the automobile exception to warrantless searches applied and therefore the search was not unconstitutional.  *See id*. at 143.

The Fourth Circuit, however, disagreed that the automobile exception applied but held that the search of the glove compartment was nevertheless lawful because the officer in that case was acting wholly under the community caretaking exception to warrantless searches of automobiles. As the Fourth Circuit made clear, the exception "only applies when the police are *not* engaged in a criminal investigation, that is, it only applies when they are 'engage[d] in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute.'" *Id*. at 143-144 (quoting *Dombrowski*, 413 U.S. at 439) (emphasis in original).   The circuit court

then found that the community caretaking exception applied to the warrantless search of the defendant's automobile because there was nothing to indicate that the park police were engaged in an attempt to detect, investigate or acquire evidence of a criminal nature -if there had been,  the search would have been unlawful because the exception did not apply when "community caretaking functions are used as a subterfuge for criminal investigations." *Id.* (quoting *Opperman*, 428 U.S. at 370 n.5).

The Fourth Circuit's opinion in *Johnson* does not support the Government's position in this case. *Johnson*, like *Garner*, did not involve the search of a person, but instead dealt with the search of an automobile, the very scenario from which the "community caretaking" exception sprung. *See Dombrowski*, 413 U.S. at 433. As discussed in *Johnson*, the Supreme Court recognized the community caretaking exception to warrantless searches of automobiles "because police often come into 'contact with vehicles for reasons related to the operation of vehicles themselves' and this 'often noncriminal contact with automobiles will bring local official in plain view of evidence, fruits, or instrumentalities of a crime, or contraband.'" *Id*. at 144 (quoting *Dombrowski*, 413 U.S. at 441-42). The search of a person, however, is constitutionally different from the search of an automobile – just as the search of a house is constitutionally different from such searches. *See Caniglia v. Strom*, ⸺ U.S. ⸺, 141 S. Ct. 1596, 1598, 209 L.Ed.2d 604 (2021) (rejecting contention that the acknowledgement of "caretaking" duties created a standalone doctrine that justified warrantless searches and seizures in the home.).[15]  Indeed, the Fourth Amendment begins with "[t]he right of the people to be secure in their *persons*…against unreasonable searches and

---

[15] In *Strom*, the Supreme Court rejected a broad interpretation of the "community caretaking" exception, noting that it had initially only been recognized by the Court in the context of warrantless searches of automobiles. *See id*. at 1599.  The Court noted that "[the] recognition that police officers perform many civic tasks in modern society was just that – a recognition that these tasks exist, and not an open-ended license to perform them anywhere*." Id*. at 1600.

seizures," confirming that, just as the "right of a man to retreat into his own home and there be free from unreasonable governmental intrusion" is at the core of the Fourth Amendment's guarantee, *see id.* at 1599, so must be the right to be free from unreasonable governmental intrusion in an individual's person.

In addition, in *Johnson* there was no dispute that the officer looked into the glove compartment solely to discover the name of the driver who had been in the traffic accident to communicate more effectively with him. *See id.* at 141-142. The Fourth Circuit found that this type of search fell squarely within the ambit of the community caretaking function because there was no indication or suggestion that there was any investigatory motive for searching the compartment. *See id.* at 145. Here, however, as discussed above, the record shows that the APD officer searched Mr. Purvis' pocket to investigate whether he had a criminal warrant as well as to determine his name. *See supra,* Section II, A, 2. That purpose removed the officer's actions out of the realm of community caretaking and no other exception to a warrantless search applies. *Johnson*, like *Garner*, presented a materially distinct situation from that involving the APD officers and Mr. Purvis.

In sum, the Government has not cited to any case where the Tenth Circuit or the Supreme Court (or any other court for that matter) has found the warrantless search of an individual's person – conducted without consent and without probable cause– and conducted in part for investigative purposes, to be justified under the community caretaking exception.

### 4. Mr. Purvis had a Reasonable Expectation of Privacy in his Pants Pocket

The Government also asserts that there was no "search" under the Fourth Amendment in this case because, under New Mexico law, Mr. Purvis had no reasonable expectation of privacy in his identification or driver's license when operating a motor vehicle. *See* Doc. 70 at 10. For this

argument, the Government relies on *State v. Reynolds*, 1995-NMSC-008, 119 N.M. 283, 890 P.2d 1315, an opinion from the New Mexico Supreme Court which held "individuals have no legitimate subjective expectation of privacy in their license, registration, or insurance documents when they are operating a motor vehicle and an officer requests to see such documents."  1995-NMSC-008, ¶ 12, 119 N.M. 283, 386 890 P.2d 1315, 1318.

Again, there are several problems with the Government's argument.  Most obviously, unlike *Reynolds*, this case does not involve a traffic stop of an automobile where an officer attempts to confirm that the person driving the automobile holds a valid driver's license.   In such a case, as correctly determined by the New Mexico Supreme Court in *Reynolds*, the driver of the automobile does not have a reasonable expectation that his driver's license can or should remain private because state law requires that drivers produce such documentation when requested.  *See id.* at ¶ 12.  But here, although the Government states that Mr. Purvis was "technically operating a motor vehicle," this case does not involve a traffic stop and at no time did Officer Golson or Officer Cervantes believe that they were investigating Mr. Purvis for anything having to do with the operation of the vehicle in which Mr. Purvis was first encountered.  The following testimony by Officer Golson demonstrates that the encounter with Mr. Purvis was not akin to a traffic stop:

> Q: (Govt. Counsel) What is the difference between in your mind between a traffic stop and this encounter?
>
> A: (Officer Golson) Well, a traffic stop is a police contact in a stop based on a moving violation of a motor vehicle.  That requires the identification of the driver being – to know that they are licensed to drive a motor vehicle, the registration, and insurance of a motor vehicle to ensure it is properly registered and insured under state laws.
>
> Q: (Govt. Counsel) And is it different from a criminal infraction and checking on the well being of someone?
>
> A: (Officer Golson) Yes.

Hrg. Tr. at 92:7-17.   From his testimony, it is clear Officer Golson was not investigating a "moving violation" or anything else related to the operation of the motor vehicle and he did not believe this encounter was similar to a traffic stop.

Nor does this case involve a "request" by an officer for a driver's license or vehicle registration.   Here, Officer Golson, without probable cause or warrant, searched the contents of Mr. Purvis' pocket without his consent.   Under these circumstances, the question is not whether the driver of an automobile lawfully stopped by a police officer has an expectation of privacy in his driver's license, as was the case in *Reynolds*.   Instead, viewed through the proper legal lens, the question is whether Mr. Purvis, who was removed from a parked vehicle only for the purpose of separating him from a potential firearm and detained under a community caretaking rationale, has a reasonable expectation of privacy in his person, or more specifically, in the contents of his pants pockets.   The Court finds that he does.

As the Tenth Circuit in *King* determined, the fact that an initial police encounter may be justified by the community caretaking doctrine does not mean that the protections of the Fourth Amendment cease.   "[A] person's Fourth Amendment rights are not eviscerated simply because a police officer may be acting in a noninvestigatory capacity for, '[i]t is surely anomalous to say that the individual…[is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.'" *King*, 990 F.2d at 1560 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 530 (1967)).   In addition, despite the Government's arguments to the contrary, there is substantial legal authority for the proposition that a defendant lawfully detained by police maintains a reasonable expectation of privacy in the contents of his/her pockets. *See Sibron v. New York*, 392 U.S. 40, 65, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (holding that a police officer "violate[d] the Fourth Amendment, which protects the sanctity of the person against unreasonable

intrusions" when he "thrust his hand into the defendant's pocket" without first engaging in a *Terry* pat down); *United States v. $53,082 in U.S. Currency*, 985 F.2d 245, 249 (6th Cir. 1993) (finding an expectation of privacy "in items carried on one's person"); *United States v. Craddock*, 841 F.3d 756, 760 (8th Cir. 2016) (reversing a district court's denial of a motion to suppress evidence found in a defendant's pocket and holding that the defendant had a "reasonable expectation of privacy in the contents of his pants pockets."); *United States v. Fennell*, 312 F.Supp.3d 568, 573 (W.D. Tex. 2018) ("a person has a reasonable expectation of privacy in the contents of his pants pockets.").

The Court disagrees with the Government's argument that no Fourth Amendment search occurred because Mr. Purvis lacked a reasonable expectation of privacy.[16]

### B.    The Inevitable Discovery Rule is Not Applicable Here.

"When the government obtains evidence through an unconstitutional search, the evidence is inadmissible under the exclusionary rule unless an exception applies." *Neugin*, 958 F.3d at 931 (citing *Mapp v. Ohio*, 367 U.S. 643, 655-58 (1961)); *see also Wong v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed. 2d 441 (1963) ("The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion."). "[A] defendant may also suppress any other evidence deemed to be 'fruit of the poisonous tree,' (i.e., evidence discovered as a direct result of the unlawful activity), by showing

---

[16] The Government also cites *United States v.  Lepinski*, 460 F.2d 234 (10th Cir. 1972), a case decided a half century ago that interpreted then-current New Mexico law regarding random traffic stops of vehicles for registration and driver's license checks.  The Court finds *Lepinksi* of little value here given that five years after that decision, the New Mexico Court of Appeals noted that the law of New Mexico had changed and no longer authorized such random stops because they would violate minimal federal constitutional standards. *See State v. Ruud*, 1977-NMCA-072, ¶¶ 7-8, 90 N.M. 647, 649–50, 567 P.2d 496, 498–99.

the requisite factual nexus between the illegality and the challenged evidence." *Neugin,* 958 F.3d at 931-32 (citing *United States v. Olivares-Rangel*, 458 F.3d 1104, 1108-09 (10th Cir. 2006)).

However, a recognized exception to the exclusionary rule is the inevitable discovery doctrine. *See United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir.2005). Under the doctrine, "illegally obtained evidence may be admitted if it ultimately or inevitably would have been discovered by lawful means." *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014) (internal quotation marks and citation omitted). It is the government's burden to prove by a preponderance of the evidence that the evidence in question "would have been discovered without the Fourth Amendment violation." *Cunningham*, 413 F.3d at 1203.  Importantly, an inevitable discovery analysis "requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred." *United States v. Souza*, 223, F.3d 1197, 1205 (10th Cir. 2000). "In determining whether the government has met its burden of proof, [courts] consider 'demonstrated historical facts,' not 'speculative elements.'" *United States v. White*, 326 F.3d 1135, 1138 (10th Cir. 2003) (quoting *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984)); accord *United States v. Owens*, 782 F.2d 146, 153 (10th Cir. 1986) ("[T]he inevitable discovery exception to the exclusionary rule cannot be invoked because of [a] highly speculative assumption of 'inevitability.'").

1. **The United States Has Not Met its Burden of Showing that the Evidence to be Suppressed Would Have Been Discovered During an Inventory Search of the Car Incident to Mr. Purvis' Arrest.**

In this case, Defendant requests the suppression of all evidence against him under the fruit of the poisonous tree doctrine.  *See* Doc. 51 at 15.  The Government does not contest that the evidence against Mr. Purvis, including his felon status, outstanding warrants, and post-arrest

statements was discovered and obtained as a direct result of the search of Mr. Purvis' pocket. Instead, the Government argues that the inevitable discovery rule applies and provides an exception to the exclusionary rule in this case.  The Government first argues that, even if the APD officers conducted an unlawful search, the evidence against Mr. Purvis would have been inevitably discovered because Officer Golson would have found the firearm and ammunition in the car during an inventory search of the vehicle incident to Defendant's arrest.  *See* Doc. 58 at 19-20.  "An inventory search is a well-defined exception to the warrant requirement of the Fourth Amendment."  *United States v. Haro–Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997).  The search is "an administrative procedure designed to produce an inventory" of a defendant's belongings. *Id*. at 773.   Inventory searches "are not treated as investigative searches because they serve three administrative purposes: the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger."  *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003).

The Government's argument is unavailing.   Whether the firearm would have been discovered during an inventory search incident to Mr. Purvis' arrest is not the issue here because, as noted previously, New Mexico state law permits motorists to carry loaded weapons, concealed or otherwise, in their vehicles.  *See* N.M. Stat. Ann. §30-7-2(A)(2) (Michie Supp. 1992).  What made the possession of the firearm unlawful was Mr. Purvis' status as a felon, which was only discovered from the information obtained through the unconstitutional search of Mr. Purvis' pants pocket.  The Government provides no cogent explanation as to how that information would have otherwise been discovered during an inventory search of the vehicle.

Moreover, an inventory search incident to arrest would have not occurred if Officer Golson had not conducted the unlawful search of Mr. Purvis' pants pocket. It is not disputed that Mr. Purvis was arrested after he was transported from the scene and it was confirmed he had outstanding warrants. *See* Doc. 58 at 19 (Government's Amended Response) ("Here, officers placed Defendant under arrested [sic] because he had outstanding warrants, thereby making Defendant's vehicle subject to towing"). The information concerning his outstanding warrants, however, was obtained by running his personal information through law enforcement databases using the information found in the items in Mr. Purvis' pocket - namely, Mr. Purvis' wallet and the driver's license within it. Thus, had it not been for the unconstitutional search of Mr. Purvis' pants pocket, he would not have been arrested and the inventory search incident to his arrest would have not occurred. The Court rejects the Government's argument on this issue.[17]

2.   **The United States Has Not Met its Burden of Showing that the Evidence to be Suppressed Would Have Been Discovered Because the Vehicle Had to Be Towed and Impounded.**

In its supplemental brief, the Government expands its argument and claims that, even if defendant's personal information was not obtained from items found in Mr. Purvis' pocket, "officers would be entitled to search the vehicle[']s glovebox for identification as it is required for

---

[17] The same rationale applies to the search of the vehicle. Once Mr. Purvis was transported from the scene by ambulance, ATF Task Force Officer Hernandez supplied an affidavit to obtain a federal search warrant for the vehicle. *See* Doc. 51-1. The warrant was executed on July 22, 2022 and resulted in the recovery of the Jimenez Arms 9mm handgun. FOF 117-119. However, the evidence provided in the ATF Task Force Officer's affidavit to obtain the search warrant included information regarding Mr. Purvis' felon status and warrants, which was discovered as a result of the unlawful search of Mr. Purvis' pockets. All of the evidence seized pursuant to the unlawful search, including evidence obtained from the subsequent search of the car, is fruit of the poisonous tree and will be suppressed. *See United States v. Pettigrew*, 468 F.3d 626, 634, (10th Cir. 2006) ("Accordingly, the exclusionary rule as it applies to the Fourth Amendment is broad and witnesses and evidence, no matter how probative, discovered only as a result of a Fourth Amendment violation, must be excluded from evidence.") (citing *Wong Sun*, 371 U.S. at 485-86).

reporting of the tow [and] [d]oing so could legally reveal the Defendant[']s name, which could then be run to determine whether he had warrants."  Doc. 70 at 15.  The Government then surmises that, "Inevitably, the Defendant's name, his criminal history and the Defendant's illegal possession of the firearm would have been discovered."  *Id*.

The Government's speculative and conclusory statement does not provide sufficient evidence to show that Mr. Purvis' personal information would have been inevitably discovered if the unlawful search of his pocket had not occurred.  First, it is unclear whether the vehicle would have been towed and impounded if Mr. Purvis had not been arrested.  The Government did not present any documentation evincing a standard policy or procedure of the Albuquerque Police Department showing that, under these circumstances, the vehicle in question would have undoubtedly been towed and impounded by the police.  At the hearing, Officer Golson, the officer in training during the detention and search of Mr. Purvis, testified that in his opinion the vehicle was required to be towed by the police, *see* Hrg. Tr. at 53:4-17, but the record shows that his training officer, Officer Cervantes, disagreed.[18]    At the scene of the incident, Officer Cervantes explained to Officer Golson that if Mr. Purvis did not have active warrants and was not subject to arrest, it would be up to the owner of the private property – in this case, Walmart, to determine if it wanted the vehicle towed.  FOF 104-111.   The Government has not shown by a preponderance of the evidence that it was inevitable the vehicle would be towed and impounded by the police if Mr. Purvis had not been placed under arrest.

More importantly, even if the vehicle had been towed and impounded, the Government cannot show, by a preponderance of the evidence, that Mr. Purvis' name and other personal

---

[18] The Government did not present the testimony of Officer Cervantes, the training officer at the scene.

identification information would have been discovered in the vehicle.   The Government argues that an individual's name is generally required for reporting purposes when a car is impounded and asserts that a search of the vehicle's glovebox may have provided Mr. Purvis' identification. *See* Doc. 70 at 15.   However, this is pure speculation on the part of the Government given that the vehicle itself was never registered to Mr. Purvis. As evidenced by Officer Golson's Uniform Incident Report, the vehicle was registered to someone named "J. Cannon." Doc. 58-5 at 1.   The Government provides no evidence of other documents or items that were found in the vehicle that would have provided the information necessary to determine Mr. Purvis' identity, let alone his felon status.  The Government's position is based on a highly speculative assumption of inevitably, which is insufficient for the exception to apply.  *See Owens*, 782 F.2d at 153.

### E.    The Statements Made by Mr. Purvis to Officer Hernandez During his Transfer will Be Excluded.

Defendant argues that the post-arrest statements he made to ATF Task Force Officer Hernandez must also be excluded as fruit of the poisonous tree. Mr. Purvis does not dispute that Officer Hernandez advised him of his *Miranda* rights before he made these statements, but nevertheless argues they should be excluded because they were made as "an extension of and derived wholly from the original constitutional violations committed by Officer Golson and his colleagues on July 22, 2020."  Doc. 51 at 16.

Incriminating statements made after an unlawful search or seizure may be inadmissible under the exclusionary rule. *See United States v. Maez*, 872 F.2d 1444, 1457 (10th Cir. 1989) (citing *Wong Sun*, 371 U.S. at 486-487). "[A] confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the casual connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'" *Taylor v. Alabama*, 457 U.S. 687, 690 (1982) (citing *Brown v.*

*Illinois*, 422 U.S. 590, 602 (1975).  *Miranda* warnings, on their own are not sufficient to make the statement a product of free will sufficient to purge the taint of an illegal search or seizure. *See Brown*, 422 U.S. at 602. ("If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted") (citation omitted). Although *Miranda* is part of the analysis, the Supreme Court has identified several additional factors that should be considered in determining whether a confession has been purged of the taint of the illegal arrest:

> The temporal proximity of the arrest and the confession, the presence of intervening circumstances, *see Johnson v. Louisiana*, 406 U.S. 356, 365 (1972), and, particularly, the purpose and flagrancy of the official misconduct are all relevant. *See Wong Sun*, 371 U.S. at 491. The voluntariness of the statement is a threshold requirement. *Cf.* 18 U.S.C. § 3501. And the burden of showing admissibility rests, of course, on the prosecution.

*Brown*, 422 U.S. at 603-04 (footnotes omitted).

Here, the Government does not address any of the *Brown* factors, but instead simply argues that Mr. Purvis' post-arrest statements should not be excluded because there was no violation of Defendant's constitutional rights.  *See* Doc. 58 at 20.  The Government fails to provide any evidence to suggest that the post-search and post-arrest statements made by Mr. Purvis were attenuated from the unlawful search such that they would not be subject to exclusion and its conclusory argument is insufficient to sustain its burden of admissibility. More specifically, the Government has provided no evidence to suggest that Mr. Purvis' statements were made voluntarily, or that they resulted from an intervening independent act of free will sufficient to purge the primary taint of the unlawful search and subsequent arrest. *See Brown*, 422 U.S. at 603. Therefore, the statements made by Mr. Purvis will also be excluded.

### III.
### CONCLUSION

The Court finds that Officer Golson and Officer Cervantes acted in their capacity as community caretakers when they first encountered Defendant as he sat in his vehicle in a private commercial parking lot.  The subsequent detention and removal of Mr. Purvis from his car was lawfully conducted after the officers observed what appeared to be a firearm in the vehicle and within reach of the Defendant.  However, the officers' actions went beyond the scope of their community caretaking role when Officer Golson conducted a search of Mr. Purvis' pockets for the purpose of, *inter alia*, obtaining and running his information through law enforcement databases to investigate his criminal history and status.  The Court finds that the warrantless search of Mr. Purvis' person, conducted without consent, violated the Fourth Amendment to the United States Constitution and no recognized justification for the unlawful search exists.  All the evidence discovered and obtained pursuant to the unlawful search, including the information which led to Mr. Purvis' arrest and the post-arrest statements he made to a federal officer, is "fruit of the poisonous tree" and therefore inadmissible.

For these reasons, the Court **GRANTS** Defendant's Opposed Motion to Suppress Evidence Based on Constitutional Violations (Doc. 51).


**IT IS SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE